1

2

3

4

5

6

7

8               IN THE UNITED STATES DISTRICT COURT

9             FOR THE EASTERN DISTRICT OF CALIFORNIA

10  RODNEY ALTON BRYANT,

11          Petitioner,              No. CIV S-09-CV-3462 GEB CHS P

12      vs.

13  JOHN W. HAVILAND, et al.,

14          Respondent.          FINDINGS AND RECOMMENDATIONS

15  _____/

16                        **I.  INTRODUCTION**

17          Petitioner, Rodney Alton Bryant, is a state prisoner proceeding pro se with a petition

18  for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner is currently serving an

19  indeterminate sentence of fifteen years to life following his 1990 guilty plea in Sacramento County

20  Superior Court to second degree murder.  Here, Petitioner does not challenge the constitutionality

21  of that conviction, but rather, the execution of his sentence, and specifically, the April 9, 2009

22  decision by the Board of Parole Hearings finding him unsuitable for parole.

23                      **II.  ISSUES PRESENTED**

24          Petitioner alleges two grounds for relief in his pending petition.  Specifically,

25  Petitioner's claims are as follows:

26          (1)     The Board's three year denial of parole based on the

                                1

1    application of Marsy's Law violated Petitioner's rights under
     the ex post facto, due process, and equal protection clauses,
2    and  subjects Petitioner to cruel and unusual punishment.

3    (2)    The Board denied Petitioner's right to due process of law by
            requiring him to discuss the commitment offense in order to
4           obtain a parole release date.

5    After careful consideration of the record and applicable law, it is recommended that

6    this petition for writ of habeas corpus relief be denied.

7                        **III. FACTUAL BACKGROUND**

8           The basic facts of Petitioner's life crime were summarized by the Presiding

9    Commissioner at Petitioner's parole hearing as follows:

10          On August 12th, 1990, Rodney Bryant . . . went fishing with his
            brother, Sean Bryant, Antonio Tavares . . . and Tavares' daughter and
11          and Bryant's girlfriend's eight-year old son . . . . The victim cruised
            by the fishing party in his motorized rubber boat and snagged a
12          fishing pole, pulling it into the river.  When the victim came back,
            Tavares fired a shotgun round into the air to stop the victim.  The
13          victim started to leave when Tavares fired another shotgun round.
            Rodney Bryant fired at least one rifle shot.  Police investigation
14          conclude[d] the victim was hit in the back by a .22 caliber cartridge
            fired by Bryant.  After the victim called out for help, the fishing party
15          gathered their equipment and left the scene.  A fisherman observed
            the victim's boat going in circles in the middle of the slough.  The
16          property caretaker and another individual eventually pulled the
            partially deflated boat to the shore.  The victim was found dead when
17          the officers arrived.  Tavares was arrested at his residence after an
            incomplete 911 call was traced to his home.  Bryant was taken into
18          custody August 13th, 1990.

19          The prisoner's version:

20          Bryant states they brought the guns with them because they had seen
            snakes in the area.  The victim had snagged Tavares' pole.  Tavares
21          wanted to go after the victim with a shotgun but Bryant told him the
            slough was a dead end and he would have to return.  When the victim
22          returned, Tavares fired a shotgun into the air.  Bryant stated he fired
            a rifle into the water, however, his view of the victim was obstructed
23          by bushes along the bank.  Upon hearing the victim's cry for help,
            Bryant suggested they go to the caretaker's house and look for help.
24          Tavares refused, ordering the others to pack up.   Bryant drove
            Tavares' truck to Tavares' house.  Bryant admits culpability and is
25          remorseful.   He feels he was not allowed a fair deal due to the
            witnesses' stories.  He stated the witnesses had not been truthful with
26          the investigators.  He pled guilty to second degree murder on advice

                                         2

1    of his lawyer.

2    (Pet. at 54-56.) Petitioner was sentenced to fifteen years to life in prison, and his minimum eligible

3    parole date passed on February 21, 2001.  On April 9, 2009, Petitioner appeared before the Board

4    of Parole Hearings (the "Board") for his third subsequent parole consideration hearing.  After

5    considering various positive and negative suitability factors, the panel concluded that Petitioner

6    would pose an unreasonable risk of danger to society if released, and concluded that he was not

7    suitable for parole.  Petitioner sought habeas corpus relief from the Board's determination in the

8    Sacramento County Superior Court.  On August 24, 2009, the court denied his petition in a reasoned

9    decision, finding that both of Petitioner's claims were without merit.  The California Court of

10   Appeal, First Appellate District, and the California Supreme Court denied relief without comment.

11   Petitioner filed this federal petition for writ of habeas corpus on December 15, 2009.  Respondent

12   filed an answer on March 12, 2010, and Petitioner filed his traverse on March 30, 2010.

13                     **IV.  APPLICABLE STANDARD OF HABEAS CORPUS REVIEW**

14           This case is governed by the provisions of the Antiterrorism and Effective Death

15   Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of *habeas corpus* filed after

16   its enactment on April 24, 1996.  *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *Jeffries v. Wood*, 114

17   F.3d 1484, 1499 (9th Cir. 1997).  Under AEDPA, an application for a writ of habeas corpus by a

18   person in custody under a judgment of a state court may be granted only for violations of the

19   Constitution or laws of the United States.  28 U.S.C. § 2254(a); *Williams v. Taylor*, 529 U.S. 362,

20   375 n. 7 (2000).  Federal *habeas corpus* relief is not available for any claim decided on the merits

21   in state court proceedings unless the state court's adjudication of the claim:

22           (1)    resulted in a decision that was contrary to, or involved an
                    unreasonable application of, clearly established federal law,
23                  as determined by the Supreme Court of the United States; or

24           (2)    resulted in a decision that was based on an unreasonable
                    determination of the facts in light of the evidence presented
25                  in the State court proceeding.

26   28 U.S.C. § 2254(d).  *See also Penry v. Johnson*, 531 U.S. 782, 792-93 (2001); *Williams v. Taylor*,

                                                    3

529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).  This court looks to the last reasoned state court decision in determining whether the law applied to a particular claim by the state courts was contrary to the law set forth in the cases of the United States Supreme Court or whether an unreasonable application of such law has occurred.  *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002).

## V.  DISCUSSION

### A.  Marsy's Law

Petitioner claims that his rights under the Ex Post Facto Clause were violated when the Board issued a three year denial of parole, pursuant to Marsy's Law, which was passed and implemented after Petitioner was convicted.  In addition, Petitioner contends that application of Marsy's law in his case violates his right to be free from cruel and unusual punishment, as well as his rights to due process and equal protection.  According to Petitioner, application of Marsy's law in his case increases the punishment for his commitment offense and decreases the likelihood that he will ever be granted a parole release date.  Petitioner argues that Marsy's Law is inapplicable to him and that future parole hearings must be held pursuant to the law in effect at the time the commitment offense occurred.

At the time Petitioner was convicted, an inmate deemed unsuitable for parole was entitled to annual subsequent parole suitability hearings.  CAL. PENAL CODE § 3041.5(b)(2) (1990). If the Board determined that it was not reasonable to expect that the inmate would be deemed suitable for parole within the year, the hearing could be deferred for two years if the Board stated the bases for so finding.  *Id.*  The Board could defer a parole suitability hearing for three years in cases where an inmate was convicted of more than one offense involving the taking of a life if the Board determined that it was not reasonable to expect the inmate would be deemed suitable within the following years and stated the bases for so finding.  *Id.*  Thus, at the time of his conviction, Petitioner, who stands convicted of a single murder, was entitled to either annual or biennial parole suitability hearings.

The law governing the frequency of parole suitability hearings has changed multiple times since Petitioner was convicted.  Immediately prior to the enactment of Marsy's Law, inmates deemed unsuitable for parole were entitled to annual parole suitability hearings, unless the Board found it unreasonable to expect that parole would be granted at a hearing during the following year, in which case a subsequent suitability hearing could be deferred for two years if the Board stated its bases for so finding. CAL. PENAL § 3041.5(b)(2) (2008).  Any inmate convicted of murder could be denied parole for a period of up to five years if the Board found it unreasonable to expect that parole would be granted during the following years and stated the bases for so finding in writing. *Id*.

On November 4, 2008, California voters passed Proposition 9, the "Victims' Bill of Rights Act of 2008: Marsy's Law," which, *inter alia*, altered the frequency of parole suitability hearings for prisoners found unsuitable for parole. Marsy's Law, which effected significant changes in the law governing frequency of parole hearings, was codified in section 3041.5(b)(3) of the California Penal Code as follows:

> The Board shall schedule the next hearing, after considering the views and interests of the victim, as follows:
>
> (A)   Fifteen years after any hearing at which parole is denied, unless the board finds by clear and convincing evidence that the criteria relevant to the setting of parole release dates enumerated in subdivision (a) of Section 3041 are such that consideration of the public and victim's safety does not require a more lengthy period of incarceration for the prisoner than 10 additional years.
>
> (B)   Ten years after any hearing at which parole is denied, unless the board finds by clear and convincing evidence that the criteria relevant to the setting of parole release dates enumerated in subdivision (a) of Section 3041 are such that consideration of the public and victim's safety does not require a more lengthy period of incarceration for the prisoner than seven additional years.
>
> (C)   Three years, five years, or seven years after any hearing at which parole is denied, because the criteria relevant to the setting of parole release dates enumerated in subdivision (a) of Section 3041 are such that consideration of the public and

5

1

2

> victim's safety requires a more lengthy period of incarceration for the prisoner, but does not require a more lengthy period of incarceration for the prisoner than seven additional years.

3

CAL. PENAL CODE § 3041.5(b)(3) (2010).  The Ninth Circuit Court of Appeals recently detailed the

significant changes accomplished by the adoption of Marcy's Law as follows:

> . . . the minimum deferral period is increased from one year to three years, the maximum deferral period is increased from five years to fifteen years. [Cal. Penal Code § 3041.5(b)(3) (2010).] Further, the burden to impose a deferral period other than the default period increased.  Before Proposition 9 was enacted, the deferral period was one year unless the Board found it was *unreasonable* to expect the prisoner would become suitable for parole within one year.  Cal. Penal Code § 3040.5(b)(2) (2008).  After Proposition 9, the deferral period is fifteen years unless the Board finds by *clear and convincing* evidence that the prisoner will be suitable for parole in ten years, in which case the deferral period is ten years.  Cal. Penal § 3041.5(b)(3)(A)-(B) (2010).  If the Board finds by clear and convincing evidence that the prisoner will be suitable for parole in seven years, the Board has the discretion to set a three-, five-, or seven-year deferral period.  *Id.* § 3041.5(b)(B)-(C).

> Proposition 9 also amended the law governing parole deferral periods by authorizing the Board to advance a hearing date.  The Board may exercise its discretion to hold an advance hearing *sua sponte* or at the request of a prisoner.  "The board may in its discretion . . . advance a hearing . . . to an earlier date, when a change in circumstances or new information establishes a reasonable likelihood that consideration of the public and victim's safety does not require the additional period of incarceration of the prisoner . . . ."  *Id.* § 3041.5(b)(4).  Also, a prisoner may request an advance hearing by submitting a written request that "set[s] forth the change in circumstances or new information that establishes a reasonable likelihood that consideration of the public safety does not require the additional period of incarceration."  *Id.* § 3041.5(d)(1).  A prisoner is limited to one such request every three years.  *Id.* § 3041.5(d)(3).  Although the minimum deferral period is three years, there is *no* minimum period the Board must wait before it holds an advance hearing.  *See id.* § 3041.5(b)(4).

*Gilman v. Schwarzenegger*, No.10-15471, slip op. at 5-6 (9th Cir. Dec. 6, 2010) (emphasis in original).

Petitioner's various constitutional challenges to Marsy's Law are problematic because they seek relief as to the future scheduling of Petitioner's next parole suitability hearing.

6

1    A prisoner's claim "for future relief (which, if successful, will not necessarily imply the invalidity
2    of confinement or shorten its duration)" is very distant from the core purpose of habeas corpus relief.
3    *Wilkinson v. Dotson*, 544 U.S. 74, 82 (2005).  In fact, habeas corpus relief is not generally available
4    unless a petitioner's claim implicates the fact or duration of confinement, as the purpose of the writ
5    is to obtain release from present or future unlawful custody.  *Preiser v. Rodrigues*, 411 U.S. 475,
6    485-86 (1973).  Consequently, the United States Supreme Court has found that where prisoners
7    sought the invalidation of state procedures used to deny parole suitability or eligibility, their claims
8    were cognizable under 42 U.S.C. § 1983.  *Wilkinson*, 544 U.S. at 82 (2005).  *See also Nelson v.*
9    *Campbell*, 541 U.S. 637, 643 (2004) ("constitutional claims that merely challenge the conditions of
10   a prisoner's confinement, whether the inmate seeks monetary or injunctive relief, fall outside [the
11   core of habeas corpus relief] . . . . " (internal citation omitted)); *Muhammad v. Close*, 540 U.S. 749,
12   750 (2004) ("Challenges to the validity of any confinement or to particulars affecting its duration
13   are the province of habeas corpus . . . [whereas] requests for relief turning on the circumstances of
14   confinement may be presented in a § 1983 action." (internal citation omitted)).  Although
15   Petitioner's ultimate goal is a speedier release on parole, the immediate relief available in the context
16   of Petitioner's current claim is to prevent the Board from applying Marsy's Law in his case, thus
17   providing him a speedier opportunity to attempt to convince the Board that he should be deemed
18   suitable for parole.  This claim is too remote from any past finding of the Board regarding
19   Petitioner's parole suitability to be cognizable for habeas corpus relief.  Thus, it is only in the
20   context of 42 U.S.C. § 1983 that Petitioner, as a plaintiff, may challenge the constitutionality of
21   Marsy's Law.

22          Further complications arise with regard to Petitioner's Ex Post Facto challenge to the
23   Board's application of Marsy's Law to his case because a class action is currently pending under 42
24   U.S.C. § 1983 with respect to the Ex Post Facto Clause and Marsy's Law.  The class action, *Gilman*
25
26

*v. Schwarzenegger*,[1] CIV-S-05-0830 LKK GGH, is proceeding on behalf of prisoners convicted of murder and serving a sentence of life with the possibility of parole with at least one parole denial, and challenges the state procedures denying class members parole as well as their deferred parole suitability hearings following a finding of parole unsuitability.  The Ninth Circuit has affirmed the District Court's order certifying the class.  *See Gilman v. Schwarzenegger*, 382 Fed.Appx. 544 (9th Cir. 2010).  It appears that Petitioner, who stands convicted of murder and has been denied parole four times,[2] is a member of the class.  As another judge in this district has explained,

> Maintaining the future aspects of the [Board's] decision into this habeas petition creates logistical difficulties.  For example, should this court decline to find that Marsy's Law is ex post facto, does petitioner remain a member of the *Gilman* class?  Does he get a second bite at the apple?  Conversely, should the *Gilman* class members not acquire relief, can petitioner still seek relief here[?] These problems highlight the policy not to permit a class member to seek injunctive relief applicable to the class outside of the class action.  A plaintiff who is a member of a class action for equitable relief from prison conditions may not maintain a separate, individual suit for equitable relief involving the same subject matter of the class action.  *See Crawford v. Bell*, 599 F.2d 890, 892-93 (9th Cir. 1979); *see also McNeil v. Guthrie*, 945 F.2d 1163, 1165 (10th Cir. 1991) ("Individual suits for injunctive and equitable relief from alleged unconstitutional prison conditions cannot be brought where there is an existing class action."; *Gillespie v. Crawford*, 858 F.2d 1101, 1103 (5th Cir. 1988) ("To allow individual suits would interfere with the orderly administration of the class action and risk inconsistent adjudications.").

*Rodgers v. Swarthout*, 2010 WL 3341852 (E.D.Cal. 2010).  In addition to these concerns, "increasing calendar congestion in the federal courts makes it imperative to avoid concurrent litigation in more than one forum whenever consistent with the rights of the parties."  *Crawford v. Bell*, 599 F.2d 890, 893 (9th Cir. 1979).  Accordingly, "[a] court may choose not to exercise its jurisdiction when another court having jurisdiction over the same matter has entertained it and can

---

[1] The class action has also been referred to using the case names *Gilman v. Davis* and *Gilman v. Fisher*, but all three case names refer to the same civil case docketed as CIV-S-05-0830 LKK GGH.

[2] The record reflects that Petitioner was denied parole at his initial parole suitability hearing and that the results of the 2009 hearing currently at issue was his third subsequent (fourth overall) hearing.

achieve the same result." *Id.* Thus, if Petitioner wishes to seek relief regarding his Ex Post Facto Claim as it relates to Marsy's Law outside of the class action, he may request to opt out of the class action and attempt to seek relief under section 1983. *McReynolds v. Richards-Cantave*, 588 F.3d 790 (2d Cir. 2009). *See also Penson v. Terminal Transp. Co., Inc.*, 634 F.2d 989, 993 (5th Cir. 1981) ("[A]lthough a member of a class certified under [Federal Rule of Civil Procedure] 23(b) has no absolute right to opt out of the class, a district court may mandate such a right pursuant to its discretionary power under Rule 23.").

To the extent Petitioner challenges the Board's 2009 determination that he was unsuitable for parole, this will be discussed in the context of his second claim, below.

**B.      Due Process in the California Parole Context**

Petitioner claims that the Board's 2009 determination that he was unsuitable for parole violated his federal right to due process of law.  In support of this claim, Petitioner alleges that the Board's decision was not supported by some evidence in the record that he remained a current danger to public safety.  Moreover, Petitioner contends the Board violated section 5011(b) of the California Penal Code, which prohibits the Board from requiring an inmate to admit guilt in order to be deemed suitable for parole.[1]

The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits state action that "deprive[s] a person of life, liberty or property without due process of law." U.S. CONST. AMEND. XIV, § 2.  A person alleging a due process violation must first demonstrate that he or she was deprived of a protected liberty or property interest, and then show

---

[1] Petitioner also claims that former Commissioner John Gillis told him that he must discuss the commitment offense in order to be found suitable for parole, and that if he continued to refuse to discuss the offense, he would never be found suitable.  Commissioner Gillis was not present at Petitioner's April 9, 2009 parole suitability hearing, the hearing being challenged by Petitioner's current federal petition for writ of habeas corpus.  Moreover, a review of the transcript of Petitioner's hearing reveals that no such statement was made to Petitioner on the record, and Petitioner does not direct the court to any place in the record to support this allegation.  Further, even assuming that the alleged statement was made to Petitioner at a previous parole suitability hearing, it would be irrelevant to Petitioner's current petition, which specifically challenges his April 9, 2009 hearing.

1   that the procedures attendant upon the deprivation were not constitutionally sufficient.  *Ky. Dep't.*

2   *Of Corrs. v. Thompson*, 490 U.S. 454, 459-60 (1989); *McQuillion v. Duncan*, 306 F.3d 895, 900 (9th

3   Cir. 2002).  A protected liberty interest may arise from either the Due Process Clause itself or from

4   state laws.  *Bd. of Pardons v. Allen*, 482 U.S. 369, 373 (1987).   In the context of parole, the United

5   States Constitution does not, in and of itself, create a protected liberty interest in the receipt of a

6   parole date, even one that has already been set.  *Jago v. Van Curen*, 454 U.S. 14, 17-21 (1981).  If

7   a state's statutory parole scheme uses mandatory language, however, it "'creates a presumption that

8   parole release will be granted' when or unless certain designated findings are made, thereby giving

9   rise to a constitutional liberty interest."  *McQuillan*, 306 F.3d at 901 (quoting *Greenholtz v. Inmates*

10  *of Neb. Penal*, 442 U.S. 1, 12 (1979)).

11          California state prisoners serving indeterminate prison sentences "may serve up to

12  life in prison, but they become eligible for parole consideration after serving minimum years of

13  confinement."  *In re Dannenberg*, 34 Cal.4th 1061, 1078 (2005).  California's statutory scheme

14  governing parole eligibility for indeterminately sentenced prisoners provides, generally, that a

15  release date will be granted unless the Board determines that "the gravity of the current convicted

16  offense or offenses, or the timing and gravity of current or past convicted offense or offense, is such

17  that consideration of the public safety requires a more lengthy period of incarceration."  CAL. PENAL

18  CODE § 3041(b).  California state prisoners whose sentences carry the possibility of parole,

19  therefore, have a clearly established, constitutionally protected liberty interest in the receipt of a

20  parole release date.  *Allen*, 482 U.S. at 377-78 (quoting *Greenholtz v Inmates of Neb. Penal*, 442

21  U.S. 1, 12 (1979)).  *See also Irons v. Carey*, 505 F.3d 846, 850-51 (9th Cir. 2007) (citing *Sass v. Cal.*

22  *Bd. of Prison Terms*, 461 F.3d 1123, 1128 (9th Cir. 2006)); *Biggs v. Terhune*, 334 F.3d 910, 914 (9th

23  Cir. 2003); *McQuillion*, 306 F.3d at 903.

24          Despite the existence of this liberty interest, it is well established that inmates are not

25  guaranteed the "full panoply of rights" during a parole suitability hearing as are normally afforded

26  to criminal defendants under the Due Process Clause.  *See Pedro v. Or. Parole Bd.*, 825 F.2d 1396,

1398-99 (9th Cir. 1987).   Nonetheless, inmates are afforded limited procedural protections.  The

Supreme Court has held that a parole board, at minimum, must give an inmate an opportunity to be

heard and a decision informing him of the reasons he did not qualify for parole.  *Hayward v.*

*Marshall*, 603 F.3d 546, 560 (9th Cir. 2010) (citing *Greenholtz*, 442 U.S. at 16).  In addition, as a

matter of state constitutional law, denial of parole to California inmates must be supported by "some

evidence" demonstrating that the inmate poses an unreasonable risk of danger to society.  *Hayward*

*v. Marshall*, 603 F.3d 546, at 562 (citing *In re Rosenkrantz*, 29 Cal.4th 616 (2002)).  *See also In re*

*Lawrence*, 44 Cal.4th at 1191 (recognizing the denial of parole must be supported by "some

evidence" that an inmate "poses a current risk to public safety"); *In re Shaputis*, 44 Cal.4th 1241,

1254 (2008) (same).  "California's 'some evidence' requirement is a component of the liberty

interest created by the parole system of [the] state," *Cooke v. Solis*, 606 F.3d 1206, 1213 (9th Cir.

2010), making compliance with this evidentiary standard mandated by the federal Due Process

Clause.  *Pearson v. Muntz*, 606 F.3d 606, 609 (9th Cir. 2010).

It is thus clear that Petitioner was entitled to an opportunity to be heard during his

parole hearing, a decision supported by some evidence that he remained a current risk to public

safety, and to be informed of the reasons that he did not qualify for parole.  In this case, Petitioner

does not contend that he was not afforded an opportunity to be heard during his parole hearing.

Indeed, the record reflects that the Board conducted Petitioner's hearing interactively, and Petitioner

was given opportunities not only to answer questions posed to him by the Board, the District

Attorney, and his own attorney, but also to personally address the Board prior to its deliberation.

Nor does Petitioner contend that the Board failed to inform him of the reasons upon which it based

its determination that he did not qualify for parole.  In fact, Petitioner's claim focuses on the

evidence cited by the Board in support of its determination that he was unsuitable for parole.

The analysis of whether a California parole board's suitability decision was supported

by "[some evidence] is framed by the [state's] statutes and regulations governing parole suitability

determinations . . . ."  *Irons*, 505 F.3d at 851.  A federal court undertaking review of a "California

1   judicial decision approving . . . [the Board's] decision rejecting parole" must determine whether the

2   state court's decision "was an 'unreasonable application' of the California 'some evidence'

3   requirement, or was 'based on an unreasonable determination of the facts in light of the evidence.'"

4   *Hayward*, 603 F.3d at 562-63 (quoting 28 U.S.C. § 2254(d)(2)).  Accordingly, this court must "look

5   to California law to determine the findings that are necessary to deem a prisoner unsuitable for

6   parole, and then must review the record to determine whether the state court decision holding that

7   these findings were supported by 'some evidence' [] constituted an unreasonable application of the

8   'some evidence' principle." *Irons*, 505 F.3d at 851.

9          Title 15, Section 2402 of the California Code of Regulations sets forth various factors

10  to be considered by the Board in making its parole suitability findings for prisoners convicted of

11  murder.  The regulation is designed to guide the Board's determination of whether the inmate would

12  pose an "unreasonable risk of danger to society if released from prison," and, thus, whether he or

13  she is suitable for parole.  *In re Lawrence*, 44 Cal.4th at 1202.  The Board is directed to consider all

14  relevant and reliable information available, including

15         the circumstances of the prisoner's: social history; past and present
       mental state; past criminal history, including involvement in other
16     criminal misconduct which is reliably documented; the base and other
       commitment offenses, including behavior before, during and after the
17     crime; past and present attitude toward the crime; any conditions of
       treatment or control, including the use of special conditions under
18     which the prisoner may safely be released to the community; and any
       other information which bears on the prisoner's suitability for release.
19     Circumstances which taken alone may not firmly establish
       unsuitability for parole may contribute to a pattern which results in
20     a finding of unsuitability.

21  15 CAL. CODE REGS. § 2402(b).  In addition, the regulation sets forth nine specific circumstances

22  tending to demonstrate suitability for parole and six specific circumstances tending to demonstrate

23  unsuitability for parole:

24         (c)    Circumstances Tending to Show Unsuitability.  The
              following circumstances each tend to indicate unsuitability
25            for release.  These circumstances are set forth as general
              guidelines; the importance attached to any circumstance or
26            combination of circumstances in a particular case is left to the

judgment of the panel.  Circumstances tending to indicate unsuitability include:

(1)    Commitment Offense.  The prisoner committed the offense in an especially heinous, atrocious or cruel manner...

(2)    Previous Record of Violence.   The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

(3)    Unstable social history.  The prisoner has a history of unstable or tumultuous relationships with others.

(4)    Sadistic Sexual Offenses.    The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

(5)    Psychological Factors.  The prisoner has a lengthy history of severe mental problems relating to the offense.

(6)    Institutional Behavior.  The prisoner has engaged in serious misconduct in prison or jail.

(d)    Circumstances Tending to Show Suitability.  The following circumstances each tend to show that the prisoner is suitable for release.   The circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel.  Circumstances tending to indicate suitability include:

(1)    No Juvenile Record.  The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

(2)    Stable Social History.  The prisoner has experienced reasonably stable relationships with others.

(3)    Signs of Remorse.   The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

(4)    Motivation for Crime.  The prisoner committed his

13

1    crime as the result of significant stress in his life,
     especially if the stress has built over a long period of
2    time.

3    (5)   Battered Woman Syndrome.   At the time of the
           commission of the crime, the prisoner suffered from
4          Battered Woman Syndrome, as defined in section
           2000(b), and it appears the criminal behavior was the
5          result of that victimization.

6    (6)   Lack of Criminal History.  The prisoner lacks any
           significant history of violent crime.
7
     (7)   Age.   The prisoner's present age reduces the
8          probability of recidivism.

9    (8)   Understanding and Plans for the Future.  The prisoner
           has made realistic plans for release or has developed
10         marketable skills that can be put to use upon release.

11   (9)   Institutional Behavior. Institutional activities indicate
           an enhanced ability to function within the law upon
12         release.

13   15 CAL. CODE REGS. § 2402(c) & (d).

14         The overriding concern is public safety, *In re Dannenberg*, 34 Cal.4th at 1086, and

15   the focus of the inquiry is on the inmate's current dangerousness.  *In re Lawrence*, 44 Cal.4th at

16   1205.  Accordingly, under California law, the standard of review is not whether some evidence

17   supports the reasons cited for denying parole, but whether some evidence indicates that an inmate's

18   release would unreasonably endanger public safety.  *In re Shaputis*, 44 Cal.4th at 1254.  Therefore,

19   "the circumstances of the commitment offense (or any of the other factors related to unsuitability)

20   establish unsuitability if, and only if, those circumstances are probative to the determination that a

21   prisoner remains a danger to the public."  *In re Lawrence*, 44 Cal4th at 1212.  In other words, there

22   must be a rational nexus between the facts relied upon and the ultimate conclusion that the prisoner

23   continues to be a threat to public safety.  *Id*. at 1227.

24         In Petitioner's case, the record reflects that the Board considered his criminal, social

25   and family history, his attitude towards the commitment offense, his institutional disciplinary record,

26   his personal progress since becoming incarcerated, his history of drug and alcohol use and treatment,

14

his psychological evaluations, his post-incarceration plans for employment and residence, and letters of support from friends and family members.  Although some applicable regulatory criteria tended to indicate that Petitioner was suitable for parole, the Board's decision to deny parole did not violate his right to due process because it is supported by some evidence.

Petitioner was born in Virginia.  His mother and father separated when he was young, and he and his siblings subsequently moved with their mother to Providence, Rhode Island.  Petitioner's father remained in Virginia, where he continued to reside at the time of Petitioner's parole hearing.  Petitioner also had four sisters and a stepbrother residing in Virginia at the time of his hearing.  Petitioner moved to Sacramento in 1984 with his mother.  He has never been married, but he has a son and a daughter from two separate relationships.  His son lives in Virginia along with Petitioner's grandchildren.  Petitioner's daughter lives in Sacramento.  Petitioner receives visits in prison from his family in the Sacramento area, which includes his mother, two sisters, two brothers, daughter, nieces and nephews, approximately every three months.

Petitioner attended high school at Hope High School in Rhode Island.  He explained that he did not complete high school because his family was preparing to move to California.  Prior to moving, Petitioner earned his GED in 1984.  In addition, he has a high school diploma from the state of California.  In 1988, Petitioner received a diploma from Columbia School of Broadcasting.  He also has a computer technician diploma.

Prior to becoming incarcerated, Petitioner was employed as a warehouse technician and a forklift operator.  He also worked in shipping and receiving.  Petitioner's drug and alcohol use was fairly limited.  He occasionally drank socially while hanging out with friends, including when he was underage.  Petitioner also admitted to experimenting with marijuana several times as a teenager.  Petitioner had not smoked marijuana on the day of the commitment offense, but he had consumed a few beers.

Since his previous parole suitability hearing in 2008, at which he was issued a one-year denial, Petitioner has availed himself of relevant self-help programming within the institution.

1    In July 2008, he completed an emotional awareness and self-healing course.  Petitioner completed

2    a domestic violence personal relationship course in November 2008.  In August 2008, Petitioner

3    completed a religious course as well as a great dads seminar.  Petitioner has also upgraded

4    educationally and vocationally.  He completed a vocational trade, and took several courses through

5    Coastline Community College.  At the time of his hearing, Petitioner was employed as a teacher's

6    assistant, a position which required him to first complete a course through the Office Services and

7    Related Training ("OSRT") program.  Petitioner presented the Board with a report from his work

8    supervisor, who rated his work performance as exceptional and above average.

9            Petitioner's most recent psychological evaluation, conducted in May 2008, opined

10   that he presented an overall low risk of danger to society.  Specifically, the psychologist found that

11   Petitioner had a very low probability of psychopathy when compared to other male offenders.  The

12   psychologist also found that Petitioner's risk of recidivism and his risk of future violence were low.

13           Petitioner offered some semblance of parole plans, presenting a packet to the Board

14   detailing his accomplishments while incarcerated as well as his parole plans, employment skills and

15   capabilities, education, and short and long-term goals and objectives.  He presented letters of support

16   from his sisters, Monique, Dawn, and Francesca, his brothers, Sean and Scott, and his mother, Mary.

17   His mother offered him a place to live upon his release and indicated that he could assist her with

18   some of her medical issues.  One of his brothers offered Petitioner employment as an assistant

19   trainer with his fitness consulting company, noting in addition that Petitioner's skills from OSRT

20   could be of assistance with maintaining, for example, the company's employee records and financial

21   statements.  Petitioner also presented a letters of support from family friends Curtis Forrester and

22   Michael Antoine.  Mr. Antoine was the owner of a computer business and offered Petitioner

23   employment as a computer technician.  Petitioner's also had a letter of support from the Richardson

24   family, Shalon, Deborah, Ariel, and Jevante, in Virginia.

25           Petitioner appeared to express remorse and accept responsibility for the commitment

26   offense.  He stated that he understood that the harms of his actions are far reaching and extend not

16

just to the victim and the victim's family, but the community as a whole and Petitioner's own family,

as well.   He described the commitment offense as impulsive and irresponsible but noted that,

although he had "to accept full responsibility because it was [his] actions that led to the tragic death

of an innocent individual," his friend, Mr. Taveres, was partially responsible for the victim's death.

(Pet. at 90.)

        Despite the positive factors in the record noted above, the Board nonetheless found

Petitioner unsuitable for parole.   In so finding, the Board relied in large part upon the gravity and

nature of the commitment offense, explaining its reasoning as follows:

> The offense is something that is indeed unchanging.   It is something
> that's never going to go away but it is something that we always look
> to because it's the baseline essentially.   It's what got you here and
> what we look for and what we hope to see is insight and a level of
> understanding and a level of remorse that really speaks to the Panel
> relative to your understanding of what you're involved [sic] that day,
> the tragic events that unfolded, your understanding of the impact and
> the effect of [sic] that family, your family, the people that were there.
> Those are all things that we look at.   And we'll speak to that in just
> a bit more in just a second, but in this case, this poor gentleman, I
> don't know whether he knowingly did this or didn't, was in a small
> dingy on one of the sloughs in Sacramento County and, apparently,
> caught, either through his prop or through his dingy someone's
> fishing line that was in your party.   I don't know if it was yours or
> your partner's and dragged the pole, I'm guessing, out into the water
> which caused you and your co-defendant to become angry and start
> yelling at him and there [was] some commentary that your partner
> was so agitated that he wanted to take immediate action but you said
> to him that 'Don't worry about it. He'll turn around and come back,'
> at which point you both armed yoursel[ves] and shots were fired.
> Now, your description of your shots, sir, [was] of shots, your vision
> was obstructed and you shot through a tree.   Interestingly enough,
> both of your shots hit a mark.   One was [the victim] and the other was
> in the dingy itself and your partner shot apparently a shotgun which
> would have been an even greater devastating weapon into the air,
> apparently, because he was not injured by that.   So your shots were
> the one[s] that killed this poor man.   We looked through your
> comments.   You didn't speak to the crime today and you don't have
> to and that's not something we will hold against you but it does leave
> us with the ability to understand your understanding of the crime by
> going through the records, looking at the psych report and we did
> look into the psych report.   I think your attorney did point to that as
> being the most recent commentary and you did speak to your
> understanding of the life crime.   There is some deflection of
> responsibility to your partner.   If he hadn't gotten so worked out that

17

perhaps it would have gone differently and that may be true. But the commentary that we looked at as well is that you, in quotes, you spoke to it on page 4 of 11, you spoke to the psychologist that, in quotes, you were trying to shoot towards a tree to alert the man. And that makes no sense to us at all why you would shoot at somebody to alert them, why not just simply yelling at somebody if you're trying to retrieve a pole or whatever it was. That was a problem for us. Additionally, we did look in the Probation Officer's Report on page 6. Mr. Taveres' 11-year old daughter made these following observations when she was interviewed by detectives and stated that she had gone fishing with her father and Mr. Bryant, Sean Bryant and Mr. Bryant's nine-year old brother. There were kids there watching all this. The victim went by a fishing party and Mr. Taveres tried to tell him to slow down. One of the poles was snagged and went into the water. She told detectives that both Mr. Bryant and Mr. Taveres, her father, grabbed guns and pointed and Mr. Taveres fired into the air. The victim apologized - - this is coming from an 11-year old girl - - apologized for the fishing pole incident and daughter then stated Mr. Bryant shot the victim and the victim yelled. That's a different characterization of what occurred than, that what we've seen from [] your commentary. So, obviously, there's a different account and they're significantly different accounts in terms of your level of responsibility that concerns us, that concerns us in several areas: one, depth of your understanding for what you've done and the depth of your understanding for your responsibility in this matter. That victim was shot and apparently died at the scene. It was carried out in a manner that was without regard to his safety, certainly, but the children that were there had to witness the two adult males acting bizarre[ly]. And they'll live with that for the rest of their li[ves]. I hope you understand that. I believe you have come to grips with some of that. We'd like to see more of that. In terms of the motive, you were angry. That was the motive. Somebody's fishing pole got taken away and a man died as a result of that. There's some level of calculation to this in our mind in that you waited for him to return. You knew he would return because it was a dead end slough.

(Pet. at 109-113.)

        A prisoner's commitment offense can be a parole unsuitability factor, and here, the circumstances of Petitioner's commitment offense fit the regulatory description for one that is especially aggravated. *See, e.g.*, 15 CAL. CODE REGS. § 2402(c)(1)(B) ("The offense was carried out in a dispassionate and calculated manner . . ."); § 2402(c)(1)(D) ("The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering."; § 2402(c)(1)(E) ("The motive for the crime is inexplicable or very trivial in relation to the offense."). In order for the circumstances of a commitment offense to support the denial of parole, however,

18

there must be "something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state," that indicates "the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination" of the prisoner's current or future dangerousness. *Cooke*, 606 F.3d at 1216 (quoting *In re Lawrence*, 44 Cal.4th at 1214). In other words, California law authorizes the Board to consider the circumstances of the commitment offense, but only to the extent that those circumstances relate to the inmate's current dangerousness. *In re Lawrence*, 44 Cal.4th at 1214.

Importantly, however, the Board did not rely exclusively on the circumstances of Petitioner's commitment offense to support the denial of parole. In addition, the Board appeared to rely on Petitioner's (1) acceptance of responsibility and level of insight into the commitment offense; (2) criminal history; (3) institutional disciplinary record; and (4) lack of consistent and continuous participation in self-help programming.

An inmate's mental state and past and present attitude towards the commitment offense are proper considerations in making a parole suitability determination. *See* 15 CAL. CODE REGS. § 2402(b); 15 CAL. CODE REGS. § 2402(d)(3). *See also In re Lazor*, 172 Cal.App.4th 1185, 1202 (2009) ("An inmate's lack of insight into, or minimizing of responsibility for, previous criminality, despite professing responsibility, is a relevant consideration."); *In re Rozzo*, 171 Cal.App.4th 40, 62 n.9 (2009) ("While it is improper to rely on a prisoner's refusal to address the circumstances of the commitment offense in denying parole, evidence that demonstrates a prisoner's insight, or lack thereof, into the reasons for his commission of the commitment offense is relevant to a determination of the prisoner's suitability for parole."). Specifically, the Board noted several inconsistencies between Petitioner's version of the events surrounding the commitment offense and the official record, and expressed concern that Petitioner minimized his participation in the commitment offense, attempted to shift responsibility for the offense to Mr. Taveres, and displayed limited insight into the cause of his actions. Because Petitioner declined to discuss the commitment offense during the hearing, as was his right under section 5011(b) of the California Penal Code, the

Board evaluated Petitioner's mental state and attitude towards the commitment offense based on statements made by Petitioner that were documented in his psychological report, the deputy probation officer's report, and the counselor's report. According to Petitioner, the Board improperly based its unsuitability determination on his refusal to discuss the commitment offense, in violation of section 5011(b), which prohibits the Board from requiring a prisoner to admit guilt to the commitment offense in order to be deemed suitable for parole. Consideration of whether an inmate lacks insight into or accepts responsibility for the commitment offense, however, does not conflict with the statutory requirement of section 5011(b). *In re Elkins*, 144 Cal. App.4th 475, 493-94 (2006). Moreover, the Board clearly informed Petitioner that he was not required to speak about the commitment offense as follows:

> All right. I said that we'll be reading into the record the statement of facts which is the crime but let me tell you a couple of things about that. You're not required to talk to us about the crime, if you don't wish to. That's between you and your attorney. The reason we read that into the record and the reason we invite you to answer questions about the crime itself is that it is one of the components that we use to help us reach a decision regarding your suitability for parole. We're not trying to retry the case. That's not our purpose when we talk to you about the crime. We accept what the court found as true and accurate but we do try to look into the individual's honesty. We try to look into an individual's mindset, perhaps, at the time of the crime. And then, we'd obviously ask follow-up questions that would indicate to us whether he's gotten better, gotten worse, stayed the same. Those help us reach our decision. But you're not required to talk to us about it. We will attempt to find other means of making that determination and we're not trying to retry the case. I just want you to understand that.

(Pet. at 44-45.) Petitioner then, by counsel, informed the Board that he did not wish to discuss the specifics of the commitment offense, but that he would discuss his feelings of remorse. (Pet. at 52.) Indeed, the Board later acknowledged Petitioner's wishes when the District Attorney attempted to question Petitioner regarding the commitment offense, reminding the District Attorney that Petitioner had invoked his right not to discuss the crime. (Pet. at 84.) Thus, the record does not support Petitioner's allegation that he was denied parole based in his invocation of his right under section 5011(b) not to discuss the commitment offense. The Board did not require Petitioner either

1    to admit guilt or to speak about the crime before it would grant him a parole date.

2           Petitioner has no juvenile record, which is a factor tending to demonstrate parole

3    suitability.  *See* CAL. CODE REGS. § 2402(d)(1).  His adult criminal record, however, consists of

4    several arrests and convictions.  An inmate's criminal history and history of violence are two factors

5    properly considered in making a parole suitability determination.  *See* CAL. CODE REGS. § 2402(b);

6    CAL. CODE REGS. § 2402(c)(2).  In 1985, Petitioner was arrested for vehicle theft, possession of

7    burglary tools, and obstructing and resisting a police officer.  All of these charges were ultimately

8    dismissed.  In 1986, Petitioner was arrested for misdemeanor possession of stolen property.  As a

9    result, he spent ten days in county jail and served a period of thirty-six months on probation.  In

10   1990, a warrant was issued for Petitioner's arrest in connection with charges of spousal abuse.

11   Petitioner pled guilty and again spent ten days in county jail followed by a period of probation.

12   Petitioner's criminal record culminated with his arrest for the commitment offense in 1990.  In

13   determining that he remained unsuitable for parole, the Board expressed concern regarding

14   Petitioner's history of domestic violence.  Specifically, the Board did not think Petitioner had

15   adequately demonstrated insight into his issues of spousal abuse and wanted to see him participate

16   in further self-help programming on the matter.

17          The Board next relied upon Petitioner's institutional disciplinary record in

18   determining that he was not yet suitable for parole.  An inmate's institutional behavior, particularly

19   where the inmate "has engaged in serious misconduct in prison or jail" can be a factor tending to

20   demonstrate unsuitability for parole.  CAL. CODE REGS. § 2402(c)(6).  Since becoming incarcerated,

21   Petitioner had incurred thirteen CDC Form 128-A Custodial Counseling Chronos for minor

22   misconduct.[1]  In addition, Petitioner had incurred twenty-one more serious CDC Form 115 Rules

23   Violation Reports, most recently (prior to the parole suitability hearing of April 9, 2009) in February

24

25
_____
26          [1] CDC Form 128-A, a "Custodial Counseling Chrono," documents incidents of minor inmate
     misconduct and the counseling provided.  Cal. Code Regs., tit. 15 § 3312 subd. (a)(2).

2003 for failing to comply with grooming standards.[1]  It should be noted that most of Petitioner's serious infractions occurred in the nineties.  The Board stated that Petitioner's institutional disciplinary record didn't weigh heavily in their decision, however it was "something [it] certainly gave consideration to because it talks about and it provides some insight as to how you're getting along in a confined situation.  And that tells us a little bit about what you might do on the outside.  So it's not the worst.  You've got a number of them but it's, but it's not the best either and you're going to need a little bit more time in between your disciplinaries and your next parole consideration hearing."  (Pet. at 114.)

          With respect to self-help programming, the Board found Petitioner's participation to be inconsistent.  *See* CAL. CODE REGS. § 2402(b) ("All relevant, reliable information available to the panel shall be considered . . .").  Although the Board recognized Petitioner's recent efforts to participate in self-help programming, it felt Petitioner was still in the process of rehabilitating himself.  The Board noted that it was only recently that Petitioner had truly begun to participate in self-help programming.  Moreover, the Board felt that many of Petitioner's statements during the hearing were robotic in that he had not provided what they considered to be "in-depth" or "heartfelt" responses to the Board's questions.  (Pet. at 115.)  The Board was concerned that Petitioner might be trying to rush the rehabilitation process and, in turn, had not adequately examined, reflected, and worked towards rehabilitation.

          Finally, the Board noted that a representative from the Sacramento County District Attorney's office had appeared to oppose the granting of parole.  Such opposition was properly noted and considered under CAL. PENAL CODE § 3046(c), however it does not constitute some evidence of Petitioner's unsuitability.  *See In re Shippman*, 185 Cal.App.4th 446, 482 (2010) ("The District Attorney's 'opinion'...is not evidence and therefore does not constitute 'some evidence' supporting the...decision.") (quoting *In re Dannenberg*, 173 Cal.App.4th 237, 256 n.5 (2010).

---

[1] CDC Form 115, a "Rules Violation Report," documents conduct that is believed to be a violation of the law or that is not minor in nature.  Cal. Code Regs., tit. § 3312 subd. (a)(3).

1    After considering the above factors, the Board reasonably determined that Petitioner

2 would pose an unreasonable risk of danger to society or a threat to public safety if released from

3 prison.  Applying the federal habeas corpus review standard applicable to parole denials for

4 California state prisoners, it is clear that some evidence supports the Board's determination that

5 Petitioner was not eligible for parole at the time of his 2009 hearing.  The Board considered both

6 positive and negative factors bearing on parole suitability, but ultimately concluded that the

7 circumstances tending to demonstrate suitability for parole did not outweigh the circumstances

8 tending to demonstrate that Petitioner was not yet suitable for parole.  15 CAL. CODE REGS. §

9 2402(b)-(d).  The circumstances of Petitioner's commitment offense combined with his level of

10 insight into the commitment offense, criminal history, institutional disciplinary record, and lack of

11 consistent and continuous participation in self-help programming provided the required modicum

12 of evidence to support the Board's denial of parole.  As reviewed above, relevant portions of the

13 evidentiary record support the evidence cited by the Board in determining Petitioner was unsuitable

14 for parole, providing a rational nexus between the evidence cited and the Board's ultimate

15 conclusion that Petitioner remained an unreasonable risk of danger to the public.  While another

16 panel might have reached a different conclusion based on the evidence, a reviewing court may not

17 re-weigh the evidence before the Board, nor may a reviewing court substitute its own judgment for

18 that of the Board.

19    The Board's decision thus withstands the minimally stringent some evidence

20 standard.  It is also clear from the record that Petitioner was given an opportunity to be heard during

21 his parole hearing and that he was informed of the reasons for the Board's decision, satisfying

22 federal due process.  Petitioner has received all process he was due and is not entitled to federal

23 habeas corpus relief on federal due process grounds.

24                                 **VI.  CONCLUSION**

25    Accordingly, IT IS RECOMMENDED that:

26

23

(1)     Petitioner's petition for writ of *habeas corpus* with respect to his challenge to the Board's determination that he was unsuitable for parole be denied; and

(2)     Petitioner's claims that Marsy's Law violates the federal due process, equal protection, and cruel and unusual punishment clauses be dismissed without prejudice, as a petition for writ of habeas corpus is the improper vehicle by which to pursue these claims; and

(3)     Petitioner's claim that Marsy's Law violates the Ex Post Facto Clause be dismissed as duplicative of a claim currently pending in the class action *Gilman v. Shwarzenegger*, CIV-S-05-0830 LKK GGH.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within seven days after service of the objections. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991). In any objections he elects to file petitioner may address whether a certificate of appealability should issue in the event he elects to file an appeal from the judgment in this case. *See* Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED: January 3, 2011

*Charlene H. Sorrentino*
CHARLENE H. SORRENTINO
UNITED STATES MAGISTRATE JUDGE

24